## PHILLIPS *vs.* COSTLEY.

[BILL IN EQUITY TO PROCURE LEGAL TITLE TO LAND.]

1. *Admissibility of parol to vary writing.*—Where a contract for the sale of lands is reduced to writing, and is plain and unambiguous in its terms, the subsequent declarations or admissions of the purchaser, as to the estate or interest purchased by him, can not be received to vary or contradict the writing.
2. *Proof of sale under decree in chancery.*—A sale of land under a decree in chancery to enforce a vendor's lien, must be proved by the record of the proceedings, or a certified copy thereof, and can not be established by the oral statements of witnesses.
3. *Notice implied from possession.*—A purchaser of land which is in the possession of a third person, without inquiry into the nature and character of that possession, is chargeable with notice of all the equitable rights which are binding on his vendor.

APPEAL from the Chancery Court of Tallapoosa.
Heard before the Hon. JAMES B. CLARK.

THE bill in this case was filed on the 28th April, 1858, by William Costley, against James D. Phillips, Claudius B. Henderson, John R. Henderson, Isaac Morris, William Davidson, Dozier Thornton, and the personal representative and heirs-at-law of Alexander Burns, deceased; and sought to procure the legal title to an undivided moiety of a certain tract of land, which was particularly described in the bill, and which the complainant claimed under a purchase from said Claudius B. Henderson. On final hearing, on pleadings and proof, the chancellor rendered a decree for the complainant, and directed the defendant Phillips to execute a deed to him. From this decree the said Phillips appeals, and here assigns it as error.

BROCK & BARNES, for appellant.
W. P. CHILTON, contra.

JUDGE, J.—On the third of May, 1852, Alexander Burns, being in the possession and claiming to be the owner, sold to Claudius B. Henderson the following described real estate, to-wit: The north-west quarter of section seven, and the east half of the south-west quarter of the same section, in township twenty, range twenty-four; also, an undivided moiety of three acres square, and of the saw and grist-mills thereon, situate in the north-west corner of section eighteen, in the same township and range; the whole situate in the county of Tallapoosa. Burns executed to Henderson a bond, conditioned to make a title when the purchase-money should be paid. About the same time, C. B. Henderson purchased of Isaac Morris the other moiety of the three acres above described, and of the mills thereon. After these purchases, respectively, C. B. Henderson claimed to be the owner of the *entire* premises; and on the 25th of October, 1853, sold to William Costley, the appellee, "one undivided half-interest" in the three acres above described and mills thereon, and also in the the three eighties in section seven, above described, making one undivided moiety of the entire premises, for the sum of one thousand and seventy dollars, which was paid by Costley at the time of the purchase. C. B. Henderson executed his bond to Cost-

ley to make him a title, "by the first day of January, 1854," and, contemporaneously with his purchase, Costley took possession of the premises, and retained such possession, as it appears, until after the commencement of this suit. C. B. Henderson, by some agreement, invested John R. Henderson with the remaining moiety of the premises, who sold the same to the said Alexander Burns, on the 18th of July, 1854. Burns took possession of the moiety thus acquired by him, and held it as co-tenant with Costley, until the death of Burns, which occurred in November, 1856.

Burns never made a title to C. B. Henderson. He was present at the sale by C. B. Henderson to Costley, witnessed the execution of the bond for title, and represented to Costley that the interest he was purchasing was unincumbered. He also represented that he, Burns, would soon procure the legal title to the premises, and would convey the same, in accordance with his obligation to Henderson, so that Costley might get a title. But, prior to Burns' death, by some arrangement with the appellant Phillips, he caused Phillips to be invested with the legal title to the entire premises. Phillips claims that he purchased from Burns for a valuable consideration, without notice of Costley's claim to one undivided moiety; and also insists that the interest purchased by Costley, from C. B. Henderson, was the *identical* interest which Henderson had purchased from Isaac Morris; that this interest had been sold under a decree of the court of chancery, to pay the purchase-money due for the same, by Henderson to Morris, and that he, Phillips, became the purchaser at said sale; and for these reasons, it is contended, Costley was not entitled to the relief sought by him in the court below.

[1.] The evidence relied on to show that complainant in the court below purchased of C. B. Henderson the identical interest which Henderson had purchased of Isaac Morris, are declarations of the complainant to that effect, testified to by several witnesses. In regard to such declarations, Mr. Greenleaf has said: "It frequently happens, not only that the witness has misunderstood what the party said, but that, by unintentionally altering a few of the expressions really used, he gives an effect to the statement com-

pletely at variance with what the party actually did say."
1 Greenl Ev. § 96.

But a well known rule of evidence requires us to discard
these declarations in determining the question as to what
interest complainant did buy from C. B. Henderson, be-
cause the contract showing the interest thus acquired is in
writing, is plain and unambiguous in its terms, and must
be its own expositor; and the declarations of the complain-
ant, as to its legal effect, are not competent evidence.—
1 Greenl. Ev. § 96, and authorities referred to in note 2.
The contract shows that complainant purchased of C. B.
Henderson "an undivided half-interest in three acres square
of land, in the north-west quarter of section eighteen, in
township twenty, range twenty-four, and also one undivided
half-interest in the grist-mill and saw-mill, and also in the
east half of the south-west quarter, and the north-west quar-
ter of section seven, in township twenty, range twenty-four."
Nothing is said in the contract about the undivided moiety of
the mill tract and mills, which had been purchased of Morris,
The purchases of C. B. Henderson, from Morris and Burns,
had centred the ownership of the entire property in him;
and in selling by undivided moieties, he did not designate
in either contract with his vendees from what particular
source he had derived the interest sold to each; and he
sold to the complainant a greater interest than he had ac-
quired from Morris, to-wit, an undivided moiety of the
three eighty-acre tracts of land, situate in section seven.
The ownership of the interest which had been sold to the
complainant, made him a tenant in common of the estate
with the owner of the other undivided moiety thereof, who
was at first John R. Henderson, and then Burns, until the
period of Burns' death; and, though tenants in common
are deemed to have several and distinct freeholds, *they have
no separate estate in any part of the land.* Each is considered
to be severally and solely seized of his share; they are
seized *per my*, but not *per tout.*—2 Black. Com. 192;
4 Kent's Com. 367; 2 Bouier's Inst. 313.

It results, then, from the contract, or the nature of the
estate created by it, that the complainant could not have
purchased the separate and identical interest which Morris

had sold. If there had been a sale of this interest under a decree in chancery, for the purpose before stated, the purchaser, by virtue of his purchase, would have become a tenant in common of the mill tract and the mills thereon, with the complainant and Burns, and his interest would have been an undivided moiety thereof. This would have reduced the interest of complainant and Burns, in the particular estate, to an ownership between them, of the remaining undivided moiety; and thus the loss to them, by the diminution of the quantity of the estate, would have fallen upon each in equal proportion, but each would have had his remedy against his immediate vendor.

2. But we need not pursue this line of argument further, nor decide what effect such a result would have had upon the case of complainant; for the record fails to show, by legal and sufficient evidence, that there ever was such a proceeding in chancery. The statements of witnesses, that there was a sale under such a decree, is not the evidence which the law requires to establish the fact that the interest which had been sold by Morris was subjected to sale under the vendor's lien, by a bill in equity. To establish this fact, if it existed, the record of the proceedings, or a properly certified transcript thereof, should have been introduced in evidence. There being no such testimony in the cause, our decision must rest upon the hypothesis that no such bill was ever filed. The averment by Phillips, in his answer, that he purchased the interest which had been thus sold, stands unsupported by any evidence.

[3.] We come next to inquire, whether Phillips was a *bona-fide* purchaser from Burns, without notice of the claim of complainant. The evidence very clearly establishes the fact, that the complainant went into the possession of the interest purchased by him, at the time of his purchase, and that he held such possession continuously, to a period of time which was subsequent to the acquisition of the legal title by Phillips. This possession was sufficient to put Phillips on inquiry, before he acquired his title; and what is sufficient for this purpose, is equivalent to notice. The doctrine is well settled, that a purchaser of land which is in the possession of a third person, without inquiry into the

Phillips v. Costley.

nature and character of that possession, is chargeable with notice of all the equitable rights which are binding on his vendor.—Shepherd's Digest, p. 701, §§ 28, 32. Phillips, then, cannot successfully invoke to his aid this defense; and we may remark, in this connection, that the allegations of the answer as to his purchase *from Burns*, are not supported by evidence. It is averred that moneys were advanced, and debts and liabilities assumed, for Burns, to the extent of twenty-eight hundred and seventy or eighty dollars; that, at first, the bonds for title of two of the prior vendors of portions of the premises, (Thornton and Davidson,) were delivered to him as a security for his advancements and assumptions; but that subsequently, on paying the amount above stated, which was the full value of the premises, he purchased the same from Burns, for that sum. There is no evidence that Phillips ever assumed or paid any debt for Burns, other than the amount of a promissory note, payable to John Britton, for one hundred and ninety-four 57-100 dollars, due the 25th of December, 1855, which Phillips paid on the 24th of March, 1856. There is no evidence showing on what consideration this note was given; and its payment constitutes the sum total of all the value shown to have been paid by Phillips, for the legal title, which he holds, to the premises in question. Britton held a mortgage from Burns, to secure the payment of this note, on one undivided moiety of the mill tract and mills, and on other lands in no way involved in this suit. This mortgage by Burns cannot affect the rights of the complainant, who seeks to have vested in him the legal title to one undivided moiety only of the premises purchased and paid for by him, and which Burns, under the circumstances, could not incumber, either by sale or mortgage.

Let the decree of the chancellor be affirmed, and the cause remanded for further proceedings pursuant thereto. The appellants must pay the costs of this court.